RECEIVED

MAY 2 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1   <u>PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY</u>

2   Name  ARDDS    Antoine    L
              (Last)              (First)              (Initial)

3

4   Prisoner Number  P-59915

5   Institutional Address  Salinas Valley State Prison
    P.O. Box 1050, Soledad, CA 93960-1050

6   ===============================================

7   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA

8   Antoine ARDDS                          )
    (Enter the full name of plaintiff in this action.)    )
                                           )                    08        647
9                                          )
                    vs.                    )
10  State of California,                   )   Case No. _____
                                           )   (To be provided by the clerk of court)
11              And                        )
                                           )   PETITION FOR A WRIT
12  R. Evans: Warden of                    )   OF HABEAS CORPUS
                                           )
13  Salinas Valley State Prison            )
                                           )
14  (Enter the full name of respondent(s) or jailor in this action)  )
                                           )
15  ===============================================

16              <u>Read Comments Carefully Before Filling In</u>

17  <u>When and Where to File</u>

18          You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23          If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a)    Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

<u>Alameda County Superior     Oakland CA</u>
Court                              Location

(b)    Case number, if known <u>A111975</u>

(c)    Date and terms of sentence <u>7/20/05 - 10/28/05 25 yrs</u>

(d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes ✓    No _____

Where?

Name of Institution: <u>Salinas valley state prison</u>

Address: <u>P.O. Box 1050, Soledad, CA 93960</u>

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

<u>PC 261(a)(2)     PC 288a(c)(2)     PC 261(a)(1)</u>
<u>PC 207(a)     PC 286(c)(2) / 664 PC. 12021(a)(1)</u>
<u>on 10/28/2005 counts 3,4,7,8,10, and 12-15 was stricken on a motion by the prosecuter, pursuant to PC. 1385.</u>

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3.  Did you have any of the following?

Arraignment:                          Yes _✗_    No _____

Preliminary Hearing:                  Yes _✗_    No _____

Motion to Suppress:                   Yes _✗_    No _____

4.  How did you plead?

Guilty _____    Not Guilty _✗_    Nolo Contendere _____

Any other plea (specify) _____

5.  If you went to trial, what kind of trial did you have?

Jury _✗_    Judge alone_____    Judge alone on a transcript _____

6.  Did you testify at your trial?              Yes _____    No _____

7.  Did you have an attorney at the following proceedings:

    (a)    Arraignment                    Yes _✗_    No _____

    (b)    Preliminary hearing            Yes _✗_    No _____

    (c)    Time of plea                   Yes _✗_    No _____

    (d)    Trial                          Yes _✗_    No _____

    (e)    Sentencing                     Yes _✗_    No _____

    (f)    Appeal                         Yes _✗_    No _____

    (g)    Other post-conviction proceeding    Yes _✗_    No _✗_

8.  Did you appeal your conviction?             Yes _✗_    No _____

    (a)    If you did, to what court(s) did you appeal?

           Court of Appeal               Yes _✗_    No _____

           Year: 7/26/06    Result: Count one Reverse / Affirmed

           Supreme Court of California   Yes _✗_    No _____

           Year: 8/29/07    Result: Denied

           Any other court               Yes _____    No _✗_

           Year: _____    Result: _____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

petition?                                      Yes  X      No____

(c)    Was there an opinion?                   Yes  X      No____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

                                               Yes ____    No  X

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?                Yes ____    No  X

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition.  You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28 U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding.  Attach extra paper if you need more space.

I.     Name of Court: _____

       Type of Proceeding: _____

       Grounds raised (Be brief but specific):

       a._____

       b._____

       c._____

       d._____

       Result: _____ Date of Result:_____

II.    Name of Court: _____

       Type of Proceeding: _____

       Grounds raised (Be brief but specific)

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1    a._____

2    b._____

3    c._____

4    d._____

5    Result: _____Date of Result:_____

6    III.    Name of Court: _____

7    Type of Proceeding: _____

8    Grounds raised (Be brief but specific):

9    a._____

10    b._____

11    c._____

12    d._____

13    Result: _____Date of Result:_____

14    IV.    Name of Court: _____

15    Type of Proceeding: _____

16    Grounds raised (Be brief but specific):

17    a._____

18    b._____

19    c._____

20    d._____

21    Result: _____Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____    No __X__

24    Name and location of court: _____

25    B. GROUNDS FOR RELIEF

26    State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27    support each claim.  For example, what legal right or privilege were you denied?  What happened?

28    Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

1   need more space.  Answer the same questions for each claim.

2        [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One: THE COURT ERRED IN ADMITING EVIDENCE

6   OF PRIOR INCIDENT OF SEX OFFENSE

7        Supporting Facts: "SEE", "State ment of FACTS ATTachment

8   A"

9

10

11       Claim Two: THE COURT ERRED IN GIVING CALJIC

12   2.50.01

13       Supporting Facts: In This case, the Jury surely deem the "1999"

14   case to have been proved beyond a reasonable doubt

15   base upon the testimony of a prior offense that

16   Appellant pled guilty, and been sentenced to Prison for.

17       Claim Three: THE Court ERRED IN Denying a motion

18   TO SEVER THE 1997 And 2003 Cases

19       Supporting Facts: See Attachment "B" For the

20   Oakland police Report that Gives more

21   Justifiable reasons that these cases should

22   have been sever.

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    People V Grant (2003) 113 Cal App 4th 579

5    People V. Harris (1998) 17 Cal. App. 4th 727

6    People V. Harris (1994) 9 Cal. 4th 407

7    Do you have an attorney for this petition?                Yes_____    No _X_

8    If you do, give the name and address of your attorney:

9    _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on  June 5, 2008

14                        Date                                        Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS         - 7 -

**SALINAS VALLEY STATE PRISON**

**DESCRIPTION OF THIS EXHIBIT:**

**NUMBER OF PAGES TO THIS EXHIBIT: _____ PAGES**

# Exhibit



## STATEMENT OF FACTS

### A.  The Diane Doe Incident

Diane Doe, who was 44 years old at the time she testified in 2005, lived with her husband and three children in Oakland on 3rd Avenue near East 12th Street on June 20, 1997.  (1 RT 219, 221-222.)  During the evening of June 19, she had gone to the home of a friend about a block away on East 12th, and she and three other women spent the night playing dominoes, drinking alcohol, and getting high on crack cocaine.  (1 RT 223-224.)  She left early on the morning of June 20 to walk home to get her children ready for school.  (1 RT 226.)  As she walked home alone, someone grabbed her at the corner of 3rd Avenue and East 12th, getting her in a choke hold so she could not speak, and dragged her to an area near a school where 3rd Avenue becomes a dead-end.  (1 RT 226-228.)[3]

She lost consciousness and then awoke.  Her pants were down and the man was hitting her.  (1 RT 229.)  She asked him to stop but he continued to rape her.  (1 RT 230.)  When he finished, he ran.  (1 RT 231.)

---

[3]  Inspector Pete Carlson of the District Attorney's Office measured the distance from 3rd Avenue and East 12th to the edge of La Escuelita School, where 3rd Avenue intersects East 11th and becomes a dead-end, as 347 feet.  (2 RT 423, 426-427, 430.)  The corner of 3rd Avenue and East 12th has more traffic and better lighting than 3rd Avenue and East 11th.  (2 RT 426, 429.)

School was not yet in session but she saw a janitor and asked him for help, but he refused to help her. (1 RT 231-232.) She pulled her pants up and crawled to the street to ask for help. (1 RT 235.) She spent three days at Highland Hospital, and her next memory was at the end of that three days because she had been kept heavily sedated due to pain. (1 RT 236-237.)

Ms. Doe had arrived at Highland Hospital by ambulance at 6:30 a.m. on June 20, and physician's assistant Hillary Larkin was involved in treating her. (2 RT 313-314, 321.) She performed a sexual assault examination of Ms. Doe from about 9 a.m. to 11 a.m. that day. (2 RT 345.) Ms. Doe said she had been assaulted by a Black male with reddish hair. (2 RT 328.) She admitted heavy alcohol use and crack cocaine use. (2 RT 325.) Her eardrums were bleeding, which is consistent with her having been strangled. (2 RT 335.) She had dirt particles in her outer vagina, which was swollen. (2 RT 340.) Ms. Larkin noted non-motile sperm on a vaginal slide prepared as part of the examination. (2 RT 343.) Ms. Larkin opined that her findings on the examination were consistent with the history she had been given by Ms. Doe. (2 RT 350.)

After the examination, Ms. Doe was admitted to the transitional care unit, which is a level between intensive care and a regular hospital bed. (2 RT 319-320, 345.) Ms. Doe was discharged from the hospital at 11:45 a.m.

on June 22. (2 RT 348.) Ms. Larkin noted that only about three percent of sexual assault victims are admitted to the hospital, and for such a person to spend two nights in the hospital was quite unusual. (2 RT 319, 349.)

Ms. Doe recalled she had described her assailant as about five feet, seven inches tall, with a medium build.[4] He had reddish hair and kind of buck teeth, with a chip in his upper front teeth. (1 RT 233-234.)

A day or two after her discharge from the hospital, Ms. Doe gave a taped statement to a police officer. In that interview, she falsely told the officer that at the time she was assaulted she was stretching after having run around the lake. She told this false story because she was trying to cover up her addiction. (2 RT 245-246.) She testified at trial that she did actually walk around the lake every morning after taking her children to school. (2 RT 249.) She continued to use drugs and alcohol until entering recovery about 14 months before she testified at trial, and she had been a user for about 10 years as of the time of the assault. (2 RT 252, 264.)

On August 3, 2004, Mr. Ardds was a participant in a live lineup. (2 RT 311.) Ms. Doe observed the lineup and did not make an identification. (2 RT 256, 299-300.) In court, Mr. Ardds did not look familiar to Ms. Doe.

---

[4] When contacted by Oakland Police Officer Paul Hopkins on July 27, 1997, then 26-year-old Mr. Ardds was 6 feet, 3 inches tall and weighed 190 pounds. (2 RT 380-383.) His hair was red. (2 RT 383, 387.)

(2 RT 300.)  Ms. Doe had never had consensual sex with Mr. Ardds.  (2 RT 256.)

The Oakland Police Department laboratory got funding for a "Cold Hit" program, and DNA analyst Chani Sentiwany of that lab began work on the Diane Doe case in May 2003.  (2 RT 438, 448-449.)  The kit had been kept frozen, and on a vaginal slide she obtained an unambiguous, single-source DNA sample from sperm from material taken from a vaginal swab. (2 RT 449-451, 453.)  After entering that profile into the data base, she obtained a fresh reference sample from a suspect.  (2 RT 454, 456.)  After obtaining that sample from Antoine Ardds, she determined that the DNA profile from the blood sample provided by Mr. Ardds on September 7, 2003, matched the DNA profile taken from the vaginal swab from Diane Doe.  That profile occurs in one in six hundred eight quadrillion people.  (2 RT 458, 477.)

### B.  The Uncharged 1999 Incident

At age 15, Kenneesha Doe, who had run away from home with her friend Venetra J., met Mr. Ardds for the first time in downtown Oakland on January 16, 1999.  (2 RT 392-394.)  They went to a laundromat, and Mr. Ardds washed their clothes.  (2 RT 395.)  They then went to a motel, where Mr. Ardds said he had a room which they could use to take showers; he did

actually have a room, and they went into a public washroom and went into stalls to change their clothes. (2 RT 397.)

When they came out of the stalls, Mr. Ardds was there, and he hit Kenneesha[5] in the jaw with a closed fist, knocking out three of her teeth. (2 RT 398-399.) He also hit Venetra, and he told them both to remove their clothes. (2 RT 403.) He had sex with Venetra, who told him that he was going in too deep and it hurt. (2 RT 404.) He made Kenneesha suck his penis, which she did because she was frightened. (2 RT 405.) She told him she had a disease, and other than oral sex he did not try to have sex with her. (2 RT 406.) Mr. Ardds made them walk with him to Sweet Jimmie's, where he let them go. (2 RT 407.)[6] A couple of months later Kenneesha saw Mr. Ardds on the street and pointed him out to police. (2 RT 412.) She heard that Mr. Ardds had pled guilty to assaulting her and that he had been sentenced to prison. (2 RT 413.)

/

/

---

[5] Throughout this brief, appellant will use first names in referring to Kenneesha and Venetra, both to protect their privacy and to avoid confusion between Kenneesha Doe and Diane Doe, given that Ms. Doe is used to refer to the latter person. No disrespect is intended by this usage.

[6] Since this incident, Kanneesha had tried to contact Venetra but had been unsuccessful. (2 RT 412.)

C.  The 2003 Case

On September 6, 2003, Darrellyn "DeeDee" Doe, who was 23 at the time of trial, went with her friend Ashawn "Shawn" Doe, who is like a sister to her, to Sweet Jimmie's.  (2 RT 478-479, 481; 3 RT 537.)  Darrellyn[7] had a boyfriend named Melvin "Joe" Michael, and at the time of trial she was pregnant with a child fathered by him, with a due date of November 1, 2005.  (2 RT 479-480.)  Ashawn was over 21 and she had been to Sweet Jimmie's previously.  (3 RT 538.)

Ashawn also was 23 at the time of trial, and she lived in Oakland with her fiancé Jermaine R.,[8] Darrellyn's brother, and Renee, Darrellyn and Jermaine's mother.  (3 RT 536-537.)  Ashawn and Mr. R. were dating in September 2003 and they were sexually active at that time.  (3 RT 538.)

Darrellyn and Ashawn arrived at Sweet Jimmie's before 10 p.m., because the cover charge was not in effect for women who arrived before 10.  (2 RT 481-482; 3 RT 541.)  Darrellyn testified that they had nothing to drink before going to Sweet Jimmie's and that they traveled there by bus,

---

[7] Throughout this brief appellant will refer to Darrellyn and Ashawn by their first names to protect their privacy and to avoid confusion with Diane Doe.  No disrespect is intended by this usage.

[8] Only the first letter of his surname is used to protect Darrellyn's and Ashawn's privacy.

but Ashawn recalled they had been drinking and smoking marijuana and thus walked rather than taking the bus. (2 RT 481-482; 3 RT 539-540.)

At Sweet Jimmie's, they met Mr. Ardds and they talked with him. (2 RT 483; 3 RT 542-543.) Darrellyn thought he seemed nice, and she danced with him, while Ashawn danced with a number of people. (2 RT 483; 3 RT 543-544.) Ashawn thought he seemed interested in Darrellyn. (3 RT 543.) At that time, Darrellyn and her fiancé Joe were having some problems, but she denied having a goal of meeting a man at Sweet Jimmie's. a place she had been previously. (2 RT 518.) However, Ashawn thought that Darrellyn was looking for a new boyfriend; her boyfriend did not have a job and he was in and out of jail. (3 RT 576-577.) Darrellyn talked with Mr. Ardds much more than Ashawn talked with him, and Ashawn thought he was trying to pick up Darrellyn. (3 RT 578-579.)

The three of them left about midnight. (2 RT 485; 3 RT 544.) Mr. Ardds said they could smoke some "weed" and he bought some from some-one near a store where he also bought a Swisher and a soda. (2 RT 485-486; 3 RT 544-545.) They then walked to a recreational vehicle (herein-after "RV")[9] near the Acorn projects, a long walk. (3 RT 546.) As they walked, their boyfriends called, and Darrellyn told them they were on their

---

[9] This RV was shown in two photos in Exhibit 29. (2 RT 487-488.)

way home. (3 RT 549.) Mr. Ardds got a key from a nearby apartment and unlocked the RV, after which they all walked inside. (2 RT 488; 3 RT 547-548.) At that point, Ashawn felt that Mr. Ardds still seemed nice, and he said nothing about having sex. (3 RT 546-548.)

Inside the RV, they drank wine coolers and smoked some "weed," although Ashawn recalled Mr. Ardds neither drank nor smoked. (2 RT 488-489; 3 RT 551.) Darrellyn then received a phone call from her brother; it was late and they decided to leave. (2 RT 489.) Mr. Ardds offered to give them a ride in the RV. (2 RT 489-490; 3 RT 522.) He reached under a bed as if to get a key, but he pulled out a gun, which Ashawn described as a black revolver, and pointed it at them. (2 RT 490; 3 RT 552-553.) He told them to take off their clothes. (2 RT 490-491; 3 RT 553.) Ashawn took off her clothes. (2 RT 491.) Darrellyn refused to do so, but Mr. Adds said he would shoot her; Ashawn urged her to remove her clothes, and she did. (2 RT 491-492; 3 RT 553-554.)

He forced them to have oral sex with each other and with him, and he had sexual intercourse with each of them. (2 RT 492-493; 554-555, 557-559.) He ejaculated inside the vagina of each of them, and he did not use a condom. (2 RT 493; 3 RT 513, 559, 564.) Both oral sex and vaginal sex occurred more than once. (2 RT 506-507; # RT 559.) At one point, he

penetrated Ashawn's anus slightly. (2 RT 492, 494; 3 RT 560.) None of these acts was consensual. (2 RT 493-494, 501-502; 3 RT 563.)

The next morning, Mr. Ardds said he was sorry, told them not to call the police, and the two young women left the RV. (2 RT 498.) Darrellyn recalled that he followed them most of the way to a bus stop, and Ashawn testified he walked them to the bus stop. (2 RT 499; 3 RT 564-565.) On the way home they decided to make up a story to explain their having been out all night, because they knew their boyfriends and Darrellyn's mother would be angry with them, and they decided to claim that two men with a gun had kidnapped them as they walked home from Sweet Jimmie's. (2 RT 500-501; 3 RT 565-566.) They went to Darrellyn's mother house. (2 RT 500.) Her mother and their boyfriends were angry with them, as they had expected. (2 RT 529-530.) Even after they told their story, including say-ing they had been raped, everyone was so angry with them that the two of them had to walk to the hospital alone. (2 RT 531-532; 3 RT 567-568.)

At the hospital, they talked with police and gave the story they had fabricated, namely, that they had been taken by two men. (3 RT 568-571.) While Ashawn was at the hospital for her sexual assault exam, the police brought Mr. Ardds to the hospital, and she recognized him. (3 RT 570.) Later, Ashwan showed police the RV. (3 RT 569.) A few days later the

police re-interviewed Ashawn, and she stayed with the abduction story. (3 RT 571-572.)

Debbie Goettsch, a physician's assistant at Highland Hospital, performs sexual assault exams. (1 RT 136-137, 139.) She noted that a woman who resists a sexual assault is more likely to have tearing, most commonly in the area of the posterior fourchette and fossa navicularis. (1 RT 145.)

Ms. Goettsch performed a sexual assault exam of Ashawn, a 22-year-old Black female, from about 2 p.m. to 4 p.m. on September 7, 2003. (1 RT 146, 150, 163-164.) In this exam, Ashawn reported her last consensual sexual intercourse had been on September 5, and she described this incident as involving vaginal penetration with a penis, penile penetration of the anus with resulting pain, and oral sex. (1 RT 155-156, 158, 160-162.) Although she had no obvious injuries on her body, she had four tears in the area of the posterior fourchette and fossa navicularis. (1 RT 164-165, 167.) Ms. Goettsch did not perform an anoscope exam because that would have been too difficult. (1 RT 170.) She saw non-motile sperm on a slide taken from a vaginal swab. (1 RT 172.) She concluded the results of her exam were consistent with the history she had been provided. (1 RT 174.)

On the same date, Ms. Goettsch had performed a sexual assault exam of Darrellyn, a 21-year-old Black female, from about 11:30 a.m. to 1:30

p.m. (1 RT 176, 194.) As had Ashawn, she described one assailant, not

two, and she said he was a Black male in his early 20's, with a gun. (1 RT

181, 203.) Ms. Goettsch saw what she suspected was semen but saw no

sperm on a vaginal slide. (1 RT 185-187.) She believed her findings were

consistent with the history she had been given. (1 RT 187.)

Officer Timothy Shaver, then a K-9 handler, was called to assist at

the corner of 8th and Adeline, in the Acorn projects on September 7, 2003.

(3 RT 613-614.) Upon arrival, he saw an RV shown in two photos in

Exhibit 29, and he was briefed by Officer Ausmus, whereupon he knocked

on doors of the RV. (3 RT 615-616.) He then opened the wing window

with a buck knife, unlocked the right front door, and entered the RV. (3 RT

616.) After Officer Shaver announced his presence, Mr. Ardds opened a

curtain and looked at him. (3 RT 617-618.) Officer Shaver handcuffed Mr.

Ardds and turned over his custody of Mr. Ardds to Officer Ausmus. (3 RT

619.) Officer Shaver checked the RV for additional people but did not

search for evidence; he had a tow truck come for the RV. (3 RT 620.) Mr.

Ardds, who gave the name Darnell Jones, was fully clothed, and Officer

Shaver did not see a gun in the RV.[10] (3 RT 620-621, 626.)

--------

[10] The RV was owned by Joseph Childress, whose brother was mar-
ried to Mr. Ardds's sister. (3 RT 714-716.) He and Mr. Ardds sometimes
did odd jobs together. (3 RT 715.) Mr. Ardds sometimes stayed in the RV;

Officer Lisa Ausmus had been called to assist at this scene at about 10:55 a.m. on September 7. (3 RT 628-629.) When Officer Shaver took Mr. Ardds into custody he had his dog in his car so Officer Ausmus took Mr. Ardds to the hospital for a sexual assault exam in her car. (3 RT 630-632.) Mr. Ardds gave the name Darnell Jones and a date of birth of April 10, 1970.[11] (3 RT 631-632.) Both alleged victims identified Mr. Ardds at a show-up at the hospital. (3 RT 623-624, 632.) Officer Eric Karsseboom searched the RV on September 8, 2003, and he did not find a gun. (3 RT 661-662.)

Chani Sentiwany examined certain evidence in regard to this case as well as the 1997 case. (3 RT 678.) Epithelial cells taken from a swab of Mr. Ardds' penis contained a mixture of two people, and Darrellyn could not be eliminated as a major donor of the DNA in that sample. (3 RT 682-684.) That DNA profile is found in fewer than one in fifty-nine million people. (3 RT 684.) Mr. Ardds could not be eliminated as a minor donor to that sample. (3 RT 684.) A sperm fraction taken from a vaginal swab from Darrellyn contained a mixture of three people, and the three who could not

he did not have a key and had to enter by opening a wing window. (3 RT 716-717.)

[11] His date of birth is September 12, 1970. (2 RT 382-383.) Officer Ausmus suspected he had given a false date of birth because when she asked for his astrological sign he gave an incorrect answer. (3 RT 632.)

be eliminated as donors were Darrelyn,[12] Mr. Michael, and Mr. Ardds.  (3 RT 697-698.)

Mr. Ardds could not be eliminated as the donor of a sperm sample from the outside of Ashawn's underwear.  (3 RT 692-693.)  That profile is found in about one in two trillion people.  (3 RT 694.)  The same findings were made as to a sperm sample from Darrellyn's underwear.  (3 RT 700-701.)

**DESCRIPTION OF THIS EXHIBIT:**

(1-4) "Peoples's EXHIBIT A-2-Pretrial Transcrip
The Idenification of the suspect is blacken out")
(1-17) "Shows why this Transcrip was blacken out
An Given To The Jury. This is the original transcrip."

**NUMBER OF PAGES TO THIS EXHIBIT:** ___22___ **PAGES**

THESE Report are To Go with
the arguments of STATEment
OF facTs in

Exhibet A (A)

# Exhibit

## B

**O·P·D**
ADDITIONAL INFORMATION REPORT

OAKLAND POLICE DEPARTMENT
455 - 7th Street
Oakland, CA 94607

RD #
97-58668

| CRIME | SUPPLEMENTAL | INCIDENT # | V1 | VICTIM LAST, First, Mid. |
|---|---|---|---|---|
| RAPE (261a (2) PC) | | 478 | | Qualls, Diane |

SUSPECT LAST, First Mid.

INCIDENT LOCATION
ACH ER

DATE OF THIS REPORT
20 Jun 97

ORIGINAL DATE REPORTED

PROPERTY (and/or NARRATIVE)

| ITEM # | QNTY. | ITEM TYPE, BRAND, MODEL #, SIZE, COLOR, MARKS, ETC | SERIAL # | VALUE |
|---|---|---|---|---|

I WAS DISPATCHED TO ACH-ER TO TAKE A RAPE
REPORT FROM THE LISTED VICTIM ~~WHO BECAME~~
~~SPOKE WITH THE SOCIAL WORKER (WHO SAID VICTIM QUALLS~~
~~SAID SHE HAD BEEN SEXUALLY ASSAULTED AND SAID SHE~~
~~DID KNOW WHO THE SUSP WAS) BUT COULD GET NO~~
~~FURTHER INFORMATION AS SHE AS AND WANTED~~

I ATTEMPTED TO TALK TO QUALLS AND WAS UNABLE TO GET
ANY INFORMATION. SHE KEPT NODDING OFF AND REFUSING TO
ANSWER MY QUESTIONS. WHEN QUALLS DID SPEAK IT WAS IN
AN EXTREMELY LOW WHISPER CAUSING ME TO HAVE TO PUT
MY EAR VERY CLOSE TO HER FACE AND STILL GETTING LIMITED
INFORMATION. IT EVENTUALLY BECAME IMPOSSIBLE TO GET
A STATEMENT FROM THE VICTIM AFTER SEVERAL TRIES. THE
HOSPITAL WAS ALSO UNABLE TO COMPLETE THE SEXUAL
ASSAULT EXAMINATION. THE MEDICAL STAFF ALSO FOUND A
CRACK PIPE IN THE VICTIMS CLOTHING.

| REPORTED BY | SERIAL # | WATCH | DISTRICT | SUPERVISOR | SERIAL # | PAGE ___ OF ___ |
|---|---|---|---|---|---|---|
| D. Evans | 2600 | 2 | 3 | | | |

TF-3044 (4NOV94)

CRI 00109

202—273

DEPT. *D1*

## SUPERIOR COURT
## ALAMEDA CO. CALIF.

ACTION #148150

PEOPLE VS ANTOINE ARDDS

**A2**

**People's Exhibit No.** _____

**Deft. Exhibit No.** _____

**For Identification** _____ JUL 11 2005

**In Evidence** _____ JUL 14 2005

_____

**Deputy County Clerk**

# PARTIAL TRANSCRIPT

INTERVIEW WITH DIANE █████

| | | |
|---|---|---|
| 1 | Taken at: | 1130 3rd Avenue, Oakland |
| 2 | Taken by: | Sergeant Larry Krupp (phonetic) |
| 3 | Date: | June 24, 1997 |
| 4 | Time: | 4:15 P.M. |
| 5 | Present: | Sergeant Larry Krupp |
| 6 | | Diane █████ |
| 7 | Transcribed by: | Kim Nutting |
| 8 | Date of Transcription: | November 30, 2004 |

9

\* \* \* \* \* \*

10

11   SERGEANT KRUPP: Today's date is 24 June, 1997. The time is 1615 hours. I'm Sergeant Larry Krupp (phonetic) with the Oakland Police Department, and I'm at Diane

12   █████' residence at 1130 3rd Avenue. And we're at – I'm here to speak with Miss █████ about a police report, a rape-and-assault report, that was filed on 20 June this year at about

13   6:45 in the morning. And for reference, that police report is number 97-58668.

13   Q.   Miss █████, you can tell that we're tape recording our interview; is that correct?

14   A.   Yes.

15   Q.   Okay. Can you give me your full name and date of birth?

16   A.   Diane Marie █████, ███████████

17   Q.   And we're at your residence now; is that correct?

   A.   Yes.

18

19   Q.   Now, as I said earlier, we talked briefly before we started, and you were assaulted on Friday morning, the 20th, and taken up to Highland Hospital, and officers contacted the hospital, and you were eventually admitted for your injuries –

20   A.   Yes.

21   Q.   -- but at that time, we were unable to take a report from you because of your physical and mental condition, so no statement was taken, which is at the preliminary report. So that's why we want to take a statement today. Okay?

22

23   A.   Okay.

24   Q.   On Friday morning, the 20th, about what time did you get up and leave the apartment?

25   A.   I was leaving at about 5:00, and it takes me about a hour.

Office of the
District
Attorney
Alameda County
California

26   Q.   Okay.
     A.   Because I –

27   Q.   So you always – you always get up around 5:00? Where do you go?

28   A.   Around Lake Merritt. I run the lake. I like – I walk halfway, and then I jog the other half.

1

1    Q.    So in the morning, you just get up early to exercise?
     A.    Yeah.

2

3    Q.    And you get up and you do it every – just about every morning?
     A.    Or every other morning.

4    Q.    Okay. And on this day, what were you wearing that day?
     A.    Some stretch pants and a sweater.

5

6    Q.    Okay.  And you left the apartment to start walking from here, 3rd Avenue and East 12th, to go towards the lake; is that right?
7    A.    Yeah.  I had ran the lake, and – I did my running.

8    Q.    Oh, so you're coming back?
     A.    Yeah.  I was coming back when I noticed – when I was coming from East 12th, I noticed
9          him coming across the street; that's when I went to her house, seeing her –

10   Q.    Okay.  So you finished coming around the lake, and you're coming back towards your house, and you notice somebody's following you?
11   A.    Yeah.

12

13   Q.    Okay.  Have you ever seen this guy before?
     A.    Never in my life.

14   Q.    Okay. What – what did this guy look like?
15   A.    Very dark skinned.

16   Q.    Male black?
     A.    Black.

17

18   Q.    Okay.
     A.    Male.

19

20   [redacted]

21

22   [redacted]

23   [redacted]

24

25   [redacted]

26   [redacted]

27

28   [redacted]

2



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Q.    Okay.  Anything else about his – you said he was dark skinned?

A.    Dark skinned with red hair and – dark red hair.

24   Q.    Okay.  Was it – look like it was natural red hair, or –

25   A.    Natural.

26   Q.    It was a natural red?

A.    He had a nappy natural.

27   Q.    Okay. How did he wear his hair?

28   A.    It was a nappy natural, little natural like Dennis Rodman have his hair, just –

'fice of the
*District*
*Attorney*
Alameda County
California

1

Q.   Okay. So he's – only quarter of an inch or inch long?
A.   It was short. Yeah.

2

Q.   Yeah.  Okay.  But it was a natural red hair?
A.   But it was – it was noticeable.

3

4

Q.   Natural red though?
A.   Yeah.

5

6

Q.   Okay.
A.   I don't know if it was natural hair, because you know how they dying their hair and –

7

Q.   Different colors?
A.   Yeah.

8

9

Q.   Okay
A.   So I don't know if it was natural or not, but it was red.

10

11

Q.   Okay.  Was it a real bright red, or more of a dark –
A.   A dark, dark red.

12

Q.   Okay.  Was he clean shaven, or did he have mustache/beard?
A.   Looked like – he didn't have no mustache or beard, but he was very unattractive.

13

14

Q.   In what way?
A.   He looked dirty.

15

16

Q.   Dirty?  So he looked like he might be a street person?
A.   Yeah. I mean, he didn't look –

17

Q.   More kind of the homeless, going from place to place type of guy, or –
A.   He looked like he could be something like that.

18

19

Q.   Okay.  Did you notice anything else about his facial features?
A.   Only his teeth.

20

21

Q.   What about?
A.   Two front teeth had two chips in the middle, and they was kind of bucked.

22

Q.   So he had bucked – kind of semi-bucked teeth?
A.   Yeah.

23

24

Q.   And they both – two front teeth were chipped?
A.   Chipped. Yeah.

25

'fice of the
*istrict*
*Attorney*
Alameda County
· California

26

Q.   Okay.  Was there a gap in them at all, or was it just chipped?
A.   No.  I don't know.  That's all I seen was the chip, and how I seen that was I was able – I was

27

opening my eyes right – I was able to keep one eye open; that's why I guess he started on
that eye.  He banged this eye up.  When I kept – I kept trying to look at him, he banged this

28

eye up.  So I couldn't visualize it too much.

(Original) Police Copy

| | | |
|---|---|---|
| 1 | Q: | Today - today's date is 24 June 97, the time is uh 1615 hours. I'm Sgt. Larry Cruff of |
| 2 | | the Oakland Police Department and I'm at Diane█████ residence at 1130 - 3ʳᵈ Avenue. |
| 3 | | Uh we're at - I'm here to speak with Ms.█████ about uh a police report - a rape and uh |
| 4 | | assault report that was filed on 20 June of this year at about uh 6:45 in the morning. |
| 5 | | And we'll reference that police report as number 97-58668. Uh Ms.█████ uh you can |
| 6 | | tell that we're tape recording our interview is that correct? |
| 7 | A: | Um yes. |
| 8 | Q: | Can you give me your full name and date of birth? |
| 9 | A: | Um Diane Marie█████ Um September 17, 1960. |
| 10 | Q: | And we're at your residence now is that correct? |
| 11 | A: | Yes. |
| 12 | Q: | Ok. Now as I said earlier, we talked briefly before we started and uh you were assault |
| 13 | | raped and assaulted uh on Friday morning the 20ᵗʰ and taken up to Highland Hospital |
| 14 | | and officers contacted you at that hospital and uh you were eventually admitted for your |
| 15 | | injuries. |
| 16 | A: | Yes. |
| 17 | Q: | And - but at that time we were unable to take a report from you because of your |
| 18 | | physical and mental condition. So no statement was taken we just have the preliminary |
| 19 | | report. So that's why we want to take the statement today. Ok? |
| 20 | A: | Ok. |
| 21 | Q: | On Friday morning the 20ᵗʰ, about what time did uh did you get up and leave the |
| 22 | | apartment? |
| 23 | A: | I always leave at about 5 and it takes me um bout an hour to - to run |
| 24 | Q: | So you always - you always get up around 5. Where do you go? |
| 25 | A: | Um around Lake Merritt. I run the lake |
| 26 | Q: | (Inaudible) |
| 27 | A: | I like - I walk half way and then I jog the other |

1   Q:   So you - in the morning you just get up early to exercise?

2   A:   Yes

3   Q:   And you get up and you do it every - just about every morning?

4   A:   About every other morning.

5   Q:   Ok.  And on this day what were you wearing that day?

6   A:   Um some stretch pants and a um a sweater.

7   Q:   A sweater.  And you left the apartment to start walking from - her at 3rd Avenue and

8        East 12th to go towards the lake is that right?

9   A:   Yeah I had ran the lake and I had - I did my running

10  Q:   Oh so'll were coming back

11  A:   Yeah I was coming back when I noticed him um when I was coming from East 12th I

12       noticed him coming across the street.  That's when I went to her house.

13  Q:   Ok

14  A:   Seen her.

15  Q:   So you finished coming around the Lake and you're coming back towards your house,

16       you notice somebody's following you?

17  A:   Yeah

18  Q:   Ok.  Have you ever seen this guy before?

19  A:   Never in my life.

20  Q:   Ok well - what this guy look like?

21  A:   Um very dark skinned

22  Q:   He's a male black?

23  A:   Black.  Um

24  Q:   Ok.

25  A:   Male

26  Q:   Was he an America?· Did he ever have an accent or anything?

27  Q:

*[handwritten: This The Report mr. klusse gave me at trial?]*

2

| | | |
|---|---|---|
| 1 | A: | No accent. |
| 2 | Q: | Ok. |
| 3 | A: | Well I don't - the only thing I - I heard him say was uh you - you crazy - you crazy "b" |
| 4 | | like that but it didn't sound like an accent to me he looked like |
| 5 | Q: | Sound like an American? |
| 6 | A: | Black yeah.  And he had |
| 7 | Q: | About - about how old was he? |
| 8 | A: | About 30 - I'd say between 30 and 38 |
| 9 | Q: | Ok so he's in mid-30's somewhere? |
| 10 | A: | Mid-30's. |
| 11 | Q: | Ok.  About how tall was he? |
| 12 | A: | He's taller then me.  I'm like about 5'4", he's probably bout 5'6" - 5'7". |
| 13 | Q: | So he's not as tall as I am then.  I'm 6 foot, so he's shorter |
| 14 | A: | No he's not as tall as you. |
| 15 | Q: | So he's about 5'7"-5'8"? |
| 16 | A: | Yeah |
| 17 | Q: | And about how much do you think he weighed?  Was he skinny?  Thin like me? Was |
| 18 | | he medium? |
| 19 | A: | He wasn't skinny.  He had on a jean - jean jacket.  Well you know what?  I really - I |
| 20 | | really couldn't tell if he was skinny or not cause he had on a big coat. |
| 21 | Q: | Ok. |
| 22 | A: | Big denim. |
| 23 | Q: | Um was he - he didn't seem to be fat or real muscular or anything? |
| 24 | A: | No you can tell from the face structure |
| 25 | Q: | Um-hum |
| 26 | A: | And it could be probably like medium build |
| 27 | Q: | Medium |

*[Handwritten note:]* At this time I was only 26 years old. This would make me at this time he 48 years of age.

*[Handwritten note:]* This whole page is in blacken for the jurors.

3

| 1 | A: | Medium to more medium slim. |
| 2 | Q: | So around 150 pounds or so in that area? |
| 3 | A: | Yeah |
| 4 | Q: | He wasn't big and fat or muscular? |
| 5 | A: | No un-un. |
| 6 | Q: | Alright and uh you said he was wearing a jean jacket with a Levi jacket? |
| 7 | A: | Yeah with the Levi jeans. |
| 8 | Q: | Ok was it a button up jacket?  Do you remember? |
| 9 | A: | Yeah it was. |
| 10 | Q: | Ok.  Any - any insignias or anything on the jacket? |
| 11 | A: | I don't - I can't remember. |
| 12 | Q: | Ok.  And just Levi regular jean pants? |
| 13 | A: | Some jeans. |
| 14 | Q: | Anything else about his uh you said he was dark skinned? |
| 15 | A: | Dark skin with red hair, dark red hair. |
| 16 | Q: | Ok was it - look like it was natural red hair or |
| 17 | A: | Natural |
| 18 | Q: | It's a natural |
| 19 | A: | It was a nappy natural. |
| 20 | Q: | Ok does he - how did he wear his hair? |
| 21 | A: | A nap - it was a nappy natural, little natural like Dennis Rodeman have his hair |
| 22 | Q: | Ok (inaudible) only uh quarter of an inch or inch long? |
| 23 | A: | It was short yeah, it was short. |
| 24 | Q: | Ok but it was a natural red hair? |
| 25 | A: | But it - but it was noticeable |
| 26 | Q: | Natural red hair? |
| 27 | A: | Yeah |

*This was also blacken for the Jury.* (handwritten)

4

1  Q:  Ok. And

2  A:  I don't know if it was his natural hair, cause you know how they dyeing their hair and

3  Q:  Different colors?

4  A:  Yeah

5  Q:  Ok

6  A:  So I don't know if it was natural or not, but I know it was red.

7  Q:  Ok.  Was it a real bright red or was it kind of a more of a dark

8  A:  A dark, more dark red.

9  Q:  Ok.  Uh was he clean shaven or did he have a mustache or a beard?

10  A:  He looked like um he didn't have no mustache or no beard but he was very unattractive.

11  Q:  In what way?

12  A:  He looked dirty.  ` THis also"

13  Q:  (inaudible) he looked like he might be a street person or?

14  A:  Yeah  Here is where she Gives up

15  Q:  Ok  Ken

16  A:  I mean he didn't look

17  Q:  More of the kind of a homeless going from place to place type of guy or

18  A:  He looked like he can be something like that.

19  Q:  Ok.  Did you notice anything else about his uh his facial features?

20  A:  Only his teeth.

21  Q:  What about his teeth

22  A:  Two front teeth had two chips in the middle and they was kinda bucked.

23  Q:  Ok so he had bucked kinda semi-bucked teeth?

24  A:  Yeah

25  Q:  And they were both the two front teeth were chipped?

26  A:  Chipped yeah.

7  Q:  Ok was there a gap in them at all or were they

5

1 A: No um I don't know

2 Q: Just chipped?

3 A: That's all I seen was - was the chip and how I'd seen that was when I was able - I was

4   opening my eyes, right, I was able to keep one eye open that's why I guess he started

5   on that eye after he banged this eye up.  When I kept - I was kept trying to look at me

6   and he banged this eye up so I couldn't visualize it to - to much.

7 Q: Alright so you notice this guy was he - as you were coming back from the Lake, you

8   notice - this is the first time you noticed him right?  You didn't see him while you were

9   running around the Lake?

10 A: No I didn't see him while I was running.

11 Q: So when you first noticed him, was he walking towards you or is it behind you?

12 A: He was walking on the other side

13 Q: On the other side the street?

14 A: Yeah.

15 Q: Ok.  Then what happened?  What brought your attention to him?

16 A: He just didn't look right.  I - I - I can feel when something is right and something is

17   wrong.  I'm running this Lake every other day

18 Q: Ok.

19 A: Then I went by this - this lady's house

20 Q: Ok.

21 A: While I seen her downstairs in the hallway and I said I think this man is following me.

22   And so she said oh are you sure?  And I said yes, she said girl that man is long gone.

23   And he must have circled the block and came back around and she said there he is

24   right there.  So she said I'm gonna watch you go home.

25 Q: Ok which lady

26 A: Walk home.

27 Q: Ok which lady was this?

6

| | | |
|---|---|---|
| 1 | A: | This is the one in the senior citizens. |
| 2 | Q: | Ok can you - know her - know her name? |
| 3 | A: | No I don't know her name, all I know is people call her mom's. I only been here three to |
| 4 | | four months, I don't - I don't know everybody. |
| 5 | Q: | So it's just somebody you saw in the front of that apartment? |
| 6 | A: | Yeah I was just looking for anybody right about then. |
| 7 | Q: | And so she - did she see this guy? |
| 8 | A: | She saw him yeah. |
| 9 | Q: | Ok and then continued to walk back towards your residence here on East 12th Street? |
| 10 | A: | Yeah why she watched me. |
| 11 | Q: | Ok. |
| 12 | A: | He come out of nowhere. Ok I come here right? And every time I always - I always this |
| 13 | | guy name Ken I talk to he a homeless guy, he was right there standing on the corner. |
| 14 | Q: | Right where? Right where? |
| 15 | A: | On East 3 - East 12th and 3rd Avenue. |
| 16 | Q: | So he was standing right here on the corner? |
| 17 | A: | Ken was standing on the corner. |
| 18 | Q: | Right where you walk - come to your house |
| 19 | A: | Yeah and I was telling him about this guy right? |
| 20 | Q: | Um-hum. |
| 21 | A: | And at 6:00 he always go and get him a beer, I don't care where he sleepin, he say well |
| 22 | | I'm gonna get me beer. And I said well ok then, I guess everything is ok. So I was so |
| 23 | | tired, I sat there and just - I'm tired you know, was just stretching and stretching my legs |
| 24 | | and next thing you know (inaudible) |
| 25 | Q: | Ok so you were sitting on the corner of 3rd and East 12th? |
| 26 | A: | I was sitting right there and somebody come out the bushes. |
| 27 | Q: | You know Ken's last name? |

7

| | | |
|---|---|---|
| 1 | A: | No. |
| 2 | Q: | Ok he's just um a guy that kinda hangs around the neighborhood and you know him like |
| 3 | | that? |
| 4 | A: | Yeah he's a homeless person. |
| 5 | Q: | So if you see him again, can you get his name for me? |
| 6 | A: | Yeah I will.  As a matter of fact |
| 7 | Q: | And if you see mom, if you see the lady you know as mom, get her name and phone |
| 8 | | number |
| 9 | A: | Ok me and my son is gonna go to the um up to Lucky's this evening, then I'll walk over |
| 10 | | there and get (inaudible) |
| 11 | Q: | Well it doesn't have to be done today, but I mean if you do - get see em, can you get |
| 12 | | their name and |
| 13 | A: | Yeah |
| 14 | Q: | Call me. |
| 15 | A: | Ok. |
| 16 | Q: | Alright.  So Ken leaves, your sitting on the corner just resting from after you jogged? |
| 17 | A: | Yeah I was stretching. |
| 18 | Q: | Ok and then what happened? |
| 19 | A: | Somebody come up from behind me and just put that - put a choke hold on me. |
| 20 | Q: | Ok was it the same guy that |
| 21 | A: | And I (inaudible) like the same guy - I did just like that, cause it was loose and loose |
| 22 | | choke hold and I did just like that and that was him (Inaudible).  Only thing I can just say |
| 23 | | is oh my god cause I knew (inaudible) gonna happen. |
| 24 | Q: | Alright so you looked - you were able to look back and it was the same guy that you |
| 25 | | saw |
| 26 | A: | Same exact guy. |
| 27 | | |

*[handwritten annotation next to line 4: "This is where she Identified her assaultive"]*

8

1  Q:  And he - for the purpose of the tape he put a choke hold so he had his arm around your

2      neck and so his elbow is right at your throat and he started squeezing?

3  A:  And (inaudible) my hand and that - his hand around my mouth

4  Q:  So you couldn't yell?

5  A:  I couldn't scream or nothing and dragged me over to the school.

6  Q:  Ok.  So he's got you in a choke hold, lifts you up he just kinda drags you to the school

7      right here

8  A:  Yeah I'm - I'm

9  Q:  Behind the house?

10  A:  Trying to fight it right?  But he's stronger then me.

11  Q:  Ok and then um bout how far did he drag you?

12  A:  Um I guess I don't know.  I don't know if it's in the middle or not, but it's by a garbage

13      can (inaudible)

14  Q:  Ok it's (inaudible) school yard?

15  A:  Yeah it's by uh it was right there by a garbage can.

16  Q:  Ok.  And then he still had you in a choke hold, dragging you from behind.

17  A:  Then the next thing you know I'm on the ground and he's choking me, just strangling

18      me

19  Q:  So now he - instead of having you in a

20  A:  Choke hold?

21  Q:  Choke hold he's got his

22  A:  He's got his hands around my neck.

23  Q:  Ok

24  A:  I don't know if he trying to cut my pipe wind off or not because it's all swollen.

25  Q:  So you're now on the ground

26  A:  And I'm on the ground and

27  Q:  (inaudible) back

9

1  A:  And (inaudible) best like um like an old shed and um I'm seeing dark tunnels and I'm -

2      I'm seeing nothing but I'm still knowing that somethin is going on but I'm still

3  Q:  So you're starting to blackout?

4  A:  Seeing nothing. Yeah.

5  Q:  Did you hear him say anything to you?  Was he using any phrases or words or?

6  A:  No

7  Q:  He just - just choking you?

8  A:  Choking me.

9  Q:  Ok did you remember him hitting you at all or?

10  A:  I remember him pulling my hair um I don't remember him hitting me, I don't know how I

11      got all the bruises up my leg and anything.  I don't remember.

12  Q:  Ok so you're on the ground and he's choking you and you kinda start - your starting to

13      fade out, blacking out what do you next remember?

14  A:  And then, you know, it seem like I said (inaudible) he's trying to kill me.  I gotta - I have

15      to do something.  So I said my prayer, I was raised in um Baptist church, my father a

16      deacon, and my father's a reverend, and I said my prayers and my strength came back

17      to me.

18  Q:  Ok

19  A:  And then that's when I start being able to fight him back, start looking for dirt and

20      anything (inaudible) scratching his face and his eyes so he could just not have a clear

21      vision of what he doing to me.

22  Q:  Ok.  At this point you're still on the ground?

23  A:  Yeah

24  Q:  Has he removed any of your clothes at this time?

25  A:  No my clothes are still on.

26  Q:  Ok so you're fighting back and what happens?

27  A:  I was fighting back and then he um removed one leg out of my pants

1  Q:  Ok. So he kinda pulled one leg out of the

2  A:  He pulled one

3  Q:  Stretch pants?

4  A:  Yeah, yeah

5  Q:  Ok.

6  A:  And um and then I seen when he was um I couldn't feel nothing, my whole body just

7      like it wasn't even here and I saw when he was sticking his penis in me. So I - it was

8      like I grabbed, what couldn't move my right hand, my left hand I grabbed my right hand I

9      grabbed his penis and just held it and just squeezed it and just try to just - just - just

10     squeeze it off and then he jumped up and said you crazy b and then um he jumped up

11     and he (inaudible) and it was like by that time I didn't have no more (inaudible) to do

12     nothing and I was just - I was (inaudible) start leaving (inaudible) fading away,

13     everything was

14  Q:  Ok was he choking you this time or is - he was walking away?

15  A:  He had stopped

16  Q:  He stopped? Ok. When he pulled you're uh one pant leg off, did he uh did he force

17      you to have oral sex at all?

18  A:  (Crying) he just sticked it in he didn't (inaudible) nothing

19  Q:  Ok do you know if he had a - a pr - a rubber on?

20  A:  I don't know.

21  Q:  You don't know?

22  A:  I don't know

23  Q:  But he definitely made penetration and that's when you were able to reach over and

24      grab his penis and squeeze hard enough where it stopped?

25  A:  (Inaudible) he just stopped I just kept squeezing it

26  Q:  Good that's excellent. And that's when he got up and left then?

27  A:  Yeah

1  Q:  Ok and then you were able after a while to gather yourself together and walk for help?

2  A:  I was scared this was like seconds, I was scared to move but I was like if I don't move

3      now, I put my leg back in my - back on

4  Q:  Um-hum.

5  A:  I said if I don't move now, then he'll probably come back and kill me, this is the only

6      chance I have.  So it was like seconds.  I um - I got up and it was a little - a little space

7      in the garbage, between the garbage and the wall and I went between the space and

8      um I was crawling at first then I started saying if I'm crawling, then he gonna come back

9      and then I started - got up and go onto my feet and was staggering and then I seen a

10     janitor open like I guess the gym door

11 Q:  Un-huh

12 A:  And I - in my - I couldn't talk, my voice was totally gone.  I still don't have my voice, but

13     it was totally gone, I say help me.  And he just looked at me, the janitor just looked at

14     me, that's all he did was just look at me.  I was like uh I passed out.  I don't know

15     maybe he was in on it, everybody was a victim to me then, I was like maybe he could

16     have been on let me just leave this man alone and just get out in the streets and try to

17     get help the best way I can.

18 Q:  So the janitor came from inside the building?

19 A:  The janitor came from yeah

20 Q:  What did he look like?

21 A:  He was black man.  He was um brown skinned with a little short uh little short haircut.

22 Q:  About how old was he?

23 A:  He looked to be a older man, probably 40's 50's

24 Q:  And so you left the school yard and then

25 A:  Then I went out to the streets and I seen a big brown house

26 Q:  Um-hum

27

1    A:    And um crawled up the stairs and I rang the doorbell, didn't nobody answer. I went and

2         sat myself in the middle of the streets, by then I didn't have a choice. I seen a garbage

3         truck, garbage truck just went right on around me, I guess they thought oh this old

4         drunk lady in the street or something, I don't know. But the garbage truck just went on

5         around me and then a man in a van came he said can you move, can you get up and I

6         said no, and I just (inaudible) my head cause my voice wasn't worth nothing here. And

7         I said no and he said um do you need help? I said yes please, and he said well I'll call

8         911. He had his cell phone and I said thank you.

9    Q:    Ok who showed up? Ambulance or police?

10    A:    The um, the um, the fire department showed up first. I remember the fire truck came

11        first.

12    Q:    Ok.

13    A:    And then it was just a release and I just told them, I said I can't - my breathing was

14        giving out on me, I said I can't breath, I need oxygen.

15    Q:    Ok did an ambulance eventually come?

16    A:    Yeah they came just like this, I mean a matter of seconds.

17    Q:    Ok and - so they trans - the ambulance transported you up to the hospital?

18    A:    Yeah

19    Q:    Ok. And then you - do you remember ever talking to an officer down the street or wait

20        at the hospital

21    A:    No

22    Q:    An officer

23    A:    I don't remember nothing.

24    Q:    Ok you remember talking to an officer at the hospital?

25    A:    Nope

26    Q:    No? Ok. Alright did this guy use any weapons at all or was it just choking and

27        (inaudible) with his fist?

13

1  A:  I don't know.

2  Q:  You remember him choking you (inaudible) point of blacking out.

3  A:  I don't know how I got all the bruises, I don't know what he used to do this.

4  Q:  According to the hospital record you had some bruises and we got all that documented.

5      Now you look pretty good now.  You're arm's still in a sling, what's wrong with your

6      arm?

7  A:  Um they said - my shoulder I think is fractured but (inaudible) gone all the way to the

8      back of my neck.

9  Q:  So you're neck's real sore but you got your arm in a sling?

10  A:  The neck and my shoulder right here, so they put my arm in a sling so my shoulder can

11      have some kind of support.

12  Q:  (Inaudible).  And I noticed your eyes are still looks like they're really badly bloodshot.

13  A:  Yeah and then I don't know how this, I guess when he was dragging me that's how this

14      got on my face.

15  Q:  That little mark on the uh looks like fingernail gouges or something huh?

16  A:  That - is that what it is?

17  Q:  Looks like it might have been fingernail - was that white spot there was it uh

18  A:  It was just like

19  Q:  Did you have that white spot there on your chin before?

20  A:  No it was just like this.

21  Q:  Ok so it looks like he rubbing your face in the asphalt or something.  This part here?

22  A:  Yeah

23  Q:  This probably looks like a scratch, rubbing in the asphalt or something and other looks

24      like fingernail marks (inaudible)

25  A:  So that's probably from me struggling with

26  Q:  Right, when he was probably choking you those are finger

27  A:  And I have the same thing on my back too as I have like right here.

14

| | | |
|---|---|---|
| 1 | Q: | That's rubbing on an asphalt when you were laying on the ground. Ok. Uh is there |
| 2 | | anything else uh that we didn't cover that you can remember? Anything I forgot to ask |
| 3 | | you? |
| 4 | A: | Um no I think I covered (inaudible) |
| 5 | Q: | I have a medical release here I'm gonna ask you to sign it for me, just in case we need |
| 6 | | your medical records I can get that, won't have to bother you again |
| 7 | A: | Ok. |
| 8 | Q: | Um. So you left to go jogging around the Lake right? |
| 9 | A: | Yeah |
| 10 | Q: | Had you been drinking that morning before? |
| 11 | A: | No I had a beer at 7:30 that night, that was uh |
| 12 | Q: | Like the night before? |
| 13 | A: | That was that Thursday. |
| 14 | Q: | And how about some - any drugs at all? |
| 15 | A: | I have like a - a little snort of a little (inaudible) of powder. |
| 16 | Q: | Ok |
| 17 | A: | That was earlier that day about noon. |
| 18 | Q: | Thursday? |
| 19 | A: | Yeah |
| 20 | Q: | Ok. They found a crack pipe in your clothing. Was that yours or? |
| 21 | A: | No that belongs to um, I'm not supposed to say, but it's not mine. |
| 22 | Q: | It's not your's, you just had it in your clothing? |
| 23 | A: | Yeah I |
| 24 | Q: | Do you have your clothing that you were wearing that day? |
| 25 | A: | No they cut em off of me. |
| 26 | Q: | Who cut them off? |
| 27 | A: | The ambulance I think, |

| | | |
|---|---|---|
| 1 | Q: | Ok |
| 2 | A: | The hospital, they cut em off me and they have them at the hospital. |
| 3 | Q: | Ok. And uh ok we got that turned in. Ok anything else, Diane that we didn't - that I |
| 4 | | forgot to ask? |
| 5 | A: | No, no. |
| 6 | Q: | No. ok. Can you think of anything else? |
| 7 | A: | No |
| 8 | Q: | You believe to identify this guy if you saw him again? |
| 9 | A: | Yes. |
| 10 | Q: | Ok. |
| 11 | A: | Yes if I can look at any mug shots or anything, I don't care what it takes I want this guy. |
| 12 | Q: | So he had real distinctive teeth |
| 13 | A: | Yep |
| 14 | Q: | And the hair, you're not sure if it's blond - dyed or natural, but it was definitely a red tint |
| 15 | | to it. |
| 16 | A: | Yeah. I would be able to recognize him. I don't care if it was dyed or what. I would be |
| 17 | | able to |
| 18 | Q: | He could have purple hair, and you'd be able to recognize him? |
| 19 | A: | I'd be able to recognize him. |
| 20 | Q: | Do you think you got any scratch marks on him when you were fight? |
| 21 | A: | I think so. |
| 22 | Q: | Besides grabbing him in his penis area, did you like mark in his face (inaudible) |
| 23 | A: | All in his face I was kept on taking all the mud, I mean all the dirt all the asphalt, it was |
| 24 | | like dirt and glass and I kept just grabbing it, just going up to his face. |
| 25 | Q: | Ok were you grabbing his face and there might be scratch marks |
| 26 | A: | Yeah I was grabbing, yea. |
| 27 | Q: | Ok. Very good. Uh I can't think of anything else. Diane |

1   A:      Ok.

2   Q:      Ok.  We'll terminate the tape.  Time is 1635 hours.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27



U.S. DISTRICT COURT
OAKLAND DIVISIONAL OFFICE
1301 CLAY STREET, SUITE 400-S
OAKLAND, CA  94612-5212

RECEIVED

MAY 2 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

U.S. COURT OF APPEALS
Office of the Clerk
95 Seventh Street
San Francisco, CA 94103-1526